## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BETH ANN MELLOTT,** | : | **CIVIL ACTION NO. 1:14-CV-00641** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **vs.** | : | |
| | : | |
| **CAROLYN W. COLVIN, ACTING** | : | |
| **COMMISSIONER OF SOCIAL** | : | |
| **SOCIAL SECURITY,** | : | |
| | : | |
| **Defendant** | : | |

## <u>MEMORANDUM</u>

### <u>Background</u>

The above-captioned action seeks review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Beth Ann Mellott's claim for social security disability insurance benefits.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  It is undisputed that Mellott meets the insured status requirements of the Social Security Act through December 31, 2015.  Tr. 19, 21, 193 and 226.[1]

---

[1]References to "Tr._" are to pages of the administrative record filed by the Defendant as part of the Answer on June 5, 2014.

Mellott protectively filed[2] her application for disability insurance benefits on March 9, 2011. Tr. 9, 80 and 177-178.   Mellott alleges that she became disabled on January 26, 2011, as the result of fibromyalgia and osteoarthritis. Tr. 19, 68-69, 80-81, 177, 187 and 197.   On July 19, 2011, the Bureau of Disability Determination[3] denied Mellott's application. Tr. 19 and 81-85.  On  August 22, 2011, Mellott filed a request for a hearing before an administrative law judge. Tr. 19 and 88-99.  The request was granted and a hearing was held on November 29, 2012. Tr. 19 and 35-67.  Mellott was represented by counsel at the hearing. Id.  On December 5, 2012, the administrative law judge issued a decision denying Mellott's application. Tr. 19-29. The administrative law judge found that Mellott failed to prove that she met the requirements of a listed impairment or suffered from work-preclusive functional limitations from January 26, 2011, through the date of the decision.  Id.  On January  15, 2013, Mellott filed a request for review with the Appeals Council. Tr.  4-15 and 271.  On March 12, 2014,  the Appeals Council concluded that there was no basis upon which to grant Mellott's request for review. Tr. 1-6.  Mellott filed the instant complaint in this court on April 3, 2014.

---

[2]A protective filing occurs when an individual initially contacts the Social Security Administration to file a claim for benefits and requests an expedited filing date. Simply stated, it allows an individual to have an application date based upon the date of his or her first contact with the Administration.

[3]The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.  Tr. 82.

Mellott  was born on November 24, 1964, and at all times relevant to this matter was considered a "younger individual"[4] whose age would not significantly impact her ability to adjust to other work. 20 C.F.R. § 404.1563(c); Tr. 38, 68, 80 and 177.  Mellott graduated from high  and can read, write, and converse in English and perform basic mathematical functions. Tr.  27, 38, 218 and 268.  During her elementary and secondary schooling, Mellott attended regular education classes and received vocational training as a medical assistant. Tr. 39 and 198.  After graduating from high school, Mellott obtained an Associate's degree in accounting. Tr. 38-39.

Mellott's work history covers 27 years and at least 12 different employers. Tr. 179-188.  In a document filed with the Social Security Administration Mellott stated that (1) from 1995 to 1999 she worked  as a bank teller and receptionist for Fulton County Bank, located in McConnellsburg, Pennsylvania; (2) from 1999 to 2000 she worked 10 hours per day at DL Martin, a machine shop, located in Mercersburg, Pennsylvania, where she would deburr, wash and pack metal items; (3) from May, 2002, to March 2003, she worked as a billing and filing clerk for an attorney, located in Chambersburg, Pennsylvania; (4) from July, 2003, to February, 2005, she worked as a bank teller and data entry clerk for Fulton County National Bank & Trust, located at various locations, including McConnellsburg; (5) from February, 2005 to February, 2007, she worked as a data entry clerk for a gas transmission company;

---

[4]The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

(6) from February, 2007 to September, 2008, she worked a secretary for Franklin/ Fulton County Developmental Disabilities, located in Chambersburg, Pennsylvania; and (7) from September, 2008, to 2011, she worked as a clerk typist for South Mountain Restoration Center (Department of Public Welfare) located in South Mountain, Pennsylvania. Tr. 249-250.

The records of the Social Security Administration reveal that Mellott had earnings in the years 1981, 1983, 1987 through 1989, and 1991 through 2012. Id. Mellott's annual earnings range from a low of $6.45 in 1993 to a high of $27,941.06 in 2010. Tr. 179.  The sum of Mellott's earnings during the period 1981 through 2010 is $185,809.57. Id.   Mellott did have earnings in 2011.  Tr. 179, 181 and 188.  However, it is not clear as to whether the total was $8578.83 or $6218.00.[5] Id.   During the first two quarters of  2012, Mellott had earnings of $3165.00.[6] Tr. 188.  On March 15, 2011, a work activity report was completed for the Social Security Administration and Mellott represented to a Social Security Administration "interviewer or reviewer" that she worked 4 to 6 hours per month out of her home performing "data entry for state licenses etc."  and that she earned a "net profit" of "less than $200.00 per

---

[5]One document indicates that Mellott earned $2360.83 in 2011. Tr. 179. A second document states that she earned $2464.00 during the 1st quarter of 2011 working for the Commonwealth of Pennsylvania Department of Public Welfare, and $1238.00 during the 3rd quarter and $2516.00 during the 4th quarter working for Gerald R. Peck Transportation, Inc. Tr. 188.

[6]In 2012, Mellott earned $1248.00 during the 1st quarter working both for the Department of Public Welfare and Gerald R. Peck Transportation, Inc.,  and $1917.00 during the second quarter working for Gerald R. Peck Transportation, Inc. Tr. 188.

month." Tr. 189 and 192.   At the administrative hearing held on November 29, 2012,

Mellott testified that she was working 10 to 12 hours per month performing "billing"

for a transportation company and earning "around $600" per month. Tr. 39.

A vocational expert identified Mellott's past relevant employment[7] as (1) a

bank teller which the vocational expert described as skilled, light work;[8] (2) a file

[7]Past relevant employment in the present case means work performed by
Mellott during the 15 years prior to the date her claim for disability was adjudicated
by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565. To be considered past
relevant work, the work must also amount to substantial gainful activity. Pursuant
to Federal Regulations a person's earnings have to rise to a certain level to be
considered substantial gainful activity.

[8]The terms sedentary and light work are defined in the regulations of the
Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more
> than 10 pounds at a time and occasionally lifting or carrying articles
> like docket files, ledgers, and small tools.  Although a sedentary job is
> defined as one which involves sitting, a certain amount of walking and
> standing is often necessary in carrying out job duties.  Jobs are
> sedentary if walking and standing are required occasionally and other
> sedentary criteria are met.

> (b) *Light work*.  Light work involves lifting no more than 20
> pounds at a time with frequent lifting or carrying of objects weighing
> up to 10 pounds.  Even though the weight lifted may be very little, a job
> is in this category when it requires a good deal of walking or standing,
> or when it involves sitting most of the time with some pushing and
> pulling of arm or leg controls.  To be considered capable of performing
> a full or wide range of light work, you must have the ability to do
> substantially all of these activities.  If someone can do light work, we
> determine that he or she can also do sedentary work, unless there are
> additional limiting factors such as  loss of fine dexterity or inability to
> sit for long periods of time.

2 C.F.R. § 404.1567.

clerk described as semi-skilled, light work; (3) a clerk typist described as semi-skilled, sedentary work; (4) a data entry clerk described as semi-skilled, sedentary work; (5) an auditor/accounting clerk described as skilled, sedentary work; and (6) an administrative clerk described as semi-skilled, light work. Tr. 60-61.

Mellott is married and lives with her husband in a house; she is able to take care of her personal needs, such as feeding and dressing herself other than she stated that it hurts to bend over, lift her arms, keep her hands above her head, sometimes breathe, and stand back up from a sitting position; she is able to feed a dog and cat but her husband changes the cat litter; she prepares her own meals; she is able to drive but not long distances and rides in a motor vehicle; she shops in stores and by mail, phone and the internet; her hobbies include reading, watching TV and cooking; she spends time with others on a daily basis socializing by phone or in her home. Tr. 38-40 and 215-219.  Mellott  is left-handed. Tr. 220.  She stated that she can lift 10 to 20 pounds and walk a 1/4 of a mile before needing to stop and rest. Id.  During the summer of 2012 Mellott took a vacation to Colorado with her husband. Tr. 41 and 554.  Her husband drove and she testified that during the trip they stopped every hour so that she could stretch.  Tr. 45.  While in Colorado they visited by vehicle the summit of Pikes Peak[9] and several other vacation sites near

---

[9]Pikes Peak Highway, a toll road, is 19.5 miles in length (39 miles round trip) with a speed limit of 25 miles per hour and the summit is at an elevation of 14,115 feet.  There are approximately 162 turns/switchbacks on the highway.  The drive takes approximately two to three hours not including stops along the way and time spent at the summit.  See Pikes Peak, America's Mountain, http://www.pikespeak.us.com/Essentials/driving-tips.html (Last accessed February 24, 2015).

Colorado Springs and her husband also went hunting.[10] Tr. 41-42.  Mellott testified
that during the summer of 2012 she also maintained a garden and worked in it 1 to 2
hours per week. Tr. 45.  She also went swimming three to four hours per week. Tr.
46.

The relevant time period in this case for assessing whether substantial
evidence supports the administrative law judge's decision is January 26, 2011,
Mellott's alleged disability onset date, until November 29, 2012, the date of the
administrative hearing.  With respect to that time period Mellott was required to
establish that she met the requirements of a listed impairment or suffered from
physical functional impairments which prevented her from engaging in full-time
work.

## I.    Standard of Review

When considering a social security appeal, we have plenary review of all legal
issues decided by the Commissioner.  See Poulos v. Commissioner of Social
Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec.
Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858
(3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant
to 42 U.S.C. § 405(g) is to determine whether those findings are supported by
"substantial evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988);
Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are

---

[10]Mellott lives in Fort Littleton, Pennsylvania.  The trip to Colorado Springs,
Colorado, is a round trip of approximately 3100 miles and involves approximately 50
hours of driving time.

supported by substantial evidence must be upheld. 42 U.S.C. §405(g); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence.").

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. <u>Brown</u>, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." <u>Consolo v. Federal Maritime Commission</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created

by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which

evidence was accepted, which evidence was rejected, and the reasons for rejecting

certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.  Therefore, a

court reviewing the decision of the Commissioner must scrutinize the record as a

whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano,

606 F.2d 403, 407 (3d Cir. 1979).

## II.    Sequential Evaluation Process

To receive disability benefits, the plaintiff must demonstrate an "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his
> physical or mental impairment or impairments are of such severity that he is
> not only unable to do his previous work but cannot, considering his age,
> education, and work experience, engage in any other kind of substantial
> gainful work which exists in the national economy, regardless of whether
> such work exists in the immediate area in which he lives, or whether a
> specific job vacancy exists for him, or whether he would be hired if he applied
> for work.  For purposes of the preceding sentence (with respect to any
> individual), "work which exists in the national economy" means work which
> exists in significant numbers either in the region where such individual lives
> or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability

insurance and supplemental security income claims.  See 20 C.F.R. §404.1520;

Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in

sequence, whether a claimant (1) is engaging in substantial gainful activity,[11] (2) has an impairment that is severe or a combination of impairments that is severe,[12] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[13] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other

---

[11]If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

[12]The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523 and 404.1545(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant's performance of basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

[13]If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

work in the national economy. Id.  As part of step four the administrative law judge

must determine the claimant's residual functional capacity. Id.[14]

Residual functional capacity is the individual's maximum remaining ability to

do sustained work activities in an ordinary work setting on a regular and continuing

basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular

and continuing basis contemplates full-time employment and is defined as eight

hours a day, five days per week or other similar schedule.  The residual functional

capacity assessment must include a discussion of the individual's abilities. Id; 20

C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is

defined as that which an individual is still able to do despite the limitations caused

by his or her impairment(s).").

## III.   **Medical Records**

Before we address the administrative law judge's decision and the arguments

of counsel, we will review Mellott's  pertinent medical records.  For background

purposes the court will commence with some medical records which predate

Mellott's alleged disability onset date of January 26, 2011.

On July 1, 2010, Mellott had an appointment with Michael D. DeMarco, D.O.,

a specialist in physical, rehabilitation and electrodiagnostic medicine, associated

with Parkway Neuroscience and Spine Institute, located in Hagerstown, Maryland.

Tr. 406-408 and 508-510.  At the appointment Mellott complained of arm pain and a

---

[14]If the claimant has the residual functional capacity to do his or her past
relevant work, the claimant is not disabled.

history of bilateral hand pain and numbness. Tr. 508.   Mellott also complained of grip weakness and loss of dexterity. Id.   Mellott denied fatigue, headache, difficulty breathing, back pain, muscle cramps, leg weakness, leg pain, neck pain, neck stiffness, calf pain, joint pain,  myalgia, decreased memory, difficulty speaking, dizziness, weakness in extremities, leg pain with walking, fainting, anxiety, depression, inability to concentrate, changes in sleep pattern, and mood changes. Id.   The results of a physical examination were completely normal, including Mellott's gait, sensation, muscle strength and coordination were normal. Id. Examination of Mellott's cervical, thoracic and lumbar spine revealed no tenderness to palpation, no pain, no paraspinous muscle spasm and normal movements. Id.  Mellott had no tenderness over the ribs or in the pelvic region. Id. She had negative straight leg raise tests bilaterally.[15] Id.  Dr. DeMarco concluded

---

[15]The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc.  The patient, either lying or sitting with the knee straight, has his or her leg lifted.  The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated-discs-straight-leg-raise (Last accessed March 3, 2015).

that there was "no electrophysiologic evidence of a cervical radiculopathy[16] or brachial plexopathy,[17] bilaterally" and "no evidence of an upper extremity nerve entrapment syndrome."[18] Tr. 510.

On August 5, 2010, Mellott had an appointment with Anthony P. Turel, Jr., M.D., a neurologist at the Penn State Milton S. Hershey Medical Center, for a multiple sclerosis evaluation. Tr. 400-403.  Mellott stated that she had "difficulty with a sensation of tingling and discomfort going into her arms with deep breathing and yawning since May 2010." Tr. 400.  Mellott reported pins and needles and an

_____

[16]Radiculopathy is a condition where one or more nerves or nerve roots are affected and do not work properly. The nerve roots are branches of the spinal cord. They carry signals to the rest of the body at each level along the spine. The nerve roots exit through holes (foramen) in the bone of the spine on the left and the right. Radiculopathy can be the result of a disc herniation or an injury causing foraminal impingement of an exiting nerve (the narrowing of the channel through which a nerve root passes). See, generally, Radiculopathy, MedicineNet.com, http://www.medicinenet.com/radiculopathy/article.htm (Last accessed March  3, 2015).

[17]Brachial plexopathy is pain, decreased movement, or decreased sensation in the arm and shoulder due to a nerve problem.  "It occurs when there is damage to the brachial plexus, an area on each side of the neck where a nerve roots from the spinal cord split into each arm's nerves." Brachial plexopathy, MedlinePlus, U.S. National Library of Medicine, National Institutes of Health, http://www.nlm.nih.gov/medlineplus/ency/article/001418.htm (Last accessed March  3, 2015).

[18] Nerves can be entrapped or compressed at various points of the upper and lower extremities, especially where a bunch of nerves pass through a "tunnel" region  found at joints and formed by ligaments, bone and/or muscle.  An example of a nerve entrapment syndrome is carpal tunnel syndrome.  See Sara L. Neal, M.D.,  & Karl B. Fields, M.D., Peripheral Nerve Entrapment and Injury in the Upper Extremity, American Family Physician, http://www. aafp.org/afp/2010/0115/p147.html (Last accessed March 3, 2015).

abnormal sensation over the upper surface of the left foot in the area between the big and second toes. Id.  Mellott reported discomfort in her right foot on the bottom surface; she reported neck pain and stiffness; she reported low back pain more on the left than on the right; she reported suffering from headaches 1-2 times a week; and she stated that her left upper extremity is weaker than the right. Tr. 400-402. Dr. Turel noted that Mellott had a shuffling gait because of the discomfort in her feet. Tr. 400.  Mellott denied any problems with neck flexion and dysesthetic sensations[19] located in the neck but complained that she had pain in her lower back when she flexes her neck; and she denied double vision or loss of vision. Tr. 401. Mellott also complained that her legs sometimes give out (feel rubbery) when she is walking. Id.  She reported no falls. Id.  Mellott had a history of smoking 1 pack of cigarettes per day for 25 years but reported that she had not smoked cigarettes for two years. Id.

Dr. Turel reviewed diagnostic studies, including blood work, and reported that Mellott's thyroid  tests, sedimentation rate[20] and complete blood count were all

---

[19]Dysesthesia is a neurological condition characterized by a distortion of the sensation which causes all external contact of the skin to feel unpleasant. See Dorland's Illustrated Medical Dictionary, 577 (32nd Ed. 2012).

[20]According to the Mayo Clinic's website the "[s]ed rate, or erythrocyte sedimentation rate (ESR), is a blood test that can reveal inflammatory activity in your body.  A sed rate test isn't a stand-alone diagnostic tool, but the result of a sed rate test may help your doctor diagnose or monitor an inflammatory disease." Sed rate (erythrocyte sedimentation rate), Definition, Mayo Clinic staff, http://www.mayoclinic.com/health/sed-rate/MY00343  (Last accessed March 3, 2015).

normal. Id.   Dr. Turel stated that a recent electromyography and nerve conduction study of Mellott's arms was normal. Id.   An MRI of the temporomandibular joints (TMJs)  revealed a non-reducing anterior dislocation of the disk of the left TMJ but there was satisfactory mobility of the mandibular condyles (the portion of the lower jaw that unites with the skull).  Id.   A physical and neurological examination of Mellott revealed mostly normal findings other than the following: (1) her gait was minimally asymmetric, i.e., she walked with a slight left leg limp, including when walking on heels and toes but tandem walking was performed relatively well;[21] (2) the Romberg test revealed a slight sway but she did not fall;[22] (3) on opening and closing the mouth she had a slight subluxation of the right side listing toward the left; and (4) she had mild muscular weakness (4.5/5 as compared to 5/5) in the left upper extremity and there was a very subtle weakness in one muscle (the iliopsoas)[23] in the left lower extremity. Tr. 402.  Dr. Turel's diagnostic impression

---

[21]The heel walk test requires the patient to walk on his or her heels. The inability to do so suggests L4-L5 nerve root irritation. The toe walk test requires the patient to walk on his or her toes. The inability to do so suggests L5-S1 nerve root irritation. Clinical Examination Terminology, MLS Group of Companies, Inc., https://www.mls-ime.com/articles/GeneralTopics/Clinical%20Examination %20Terminology.html (Last accessed March 3, 2015). A tandem walk or gait is a method of walking where the toes of the back foot touch the heel of the front foot at each step.

[22]Romberg test is a neurological test to detect poor balance. It detects the inability to maintain a steady standing posture with the eyes closed.

[23]The iliopsoas actually consists of two muscles of the hip region. They originate at the lumbar vertebrae and attach at a portion of the upper leg bone (the femur).  See Dorland's Illustrated Medical Dictionary, 1206 (32nd Ed. 2012).

was that Mellott suffered from the following conditions: (1) numbness, possible

cervical spondylosis;[24] (2) possible lumbosacral radiculopathy; (3) "doubt multiple

sclerosis"; (4) musculoskeletal headaches; (5) mild obesity; and (6) possible plantar

fasciitis.[25] Tr. 402-403.

 Dr. Turel ordered an MRI of Mellott's cervical and lumbosacral spine to

determine whether or not Mellott suffered from cervical spondylosis, lumbar disc

---

[24]Degeneration of the vertebrae and intervertebral discs is medically referred to as spondylosis. Spondylosis can be noted on x-ray tests or MRI scanning of the spine as a narrowing of the normal "disc space" between the adjacent vertebrae. The term is frequently used to describe osteoarthritis of the spine.

[25]"Plantar fasciitis . . . is one of the most common causes of heel pain. It involves pain and inflammation of a thick band of tissue, called the plantar fascia, that runs across the bottom of [the] foot and connects [the] heel bone to your toes. Plantar fasciitis commonly causes stabbing pain that usually occurs with [the] very first step in the morning. Once your foot limbers up, the pain of plantar fasciitis normally decreases, but it may return after long periods of standing or after getting up from a seated position."  Plantar fasciitis, Definition, Mayo clinic staff, http://www.mayoclinic.com/health/plantar-fasciitis/DS00508 (Last accessed March 3, 2015). Causes of plantar fasciitis are the overstretching or overuse of the plantar fascia, the thick band of tissue. Plantar fasciitis, A.D.A.M. Medical Encyclopedia, PubMed Health, U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0004438/ (Last accessed March 3, 2015).  It "is commonly thought of as being caused by a heel spur, but research has found that this is not the case.  On x-ray, heel spurs are seen in people with and without plantar fasciitis." Id.; see also Plantar Fasciitis and Bone Spurs, OrthoInfo, American Academy of Orthopaedic Surgeons, http://orthoinfo.aaos.org/ topic.cfm?topic=a00149 (Last accessed March 3, 2015).  Risk factors for plantar fasciitis include tighter calf muscles that make it difficult to flex the foot and bring the toes up toward the shin, obesity, a very high arch, repetitive impact activity and new or increased activity. Id.

disease and/or demyelinating disease,[26] and noted that Mellott would be seen at a follow-up appointment after the imaging studies were completed. Tr. 403.  The MRIs were performed on September 2, 2010, and revealed degenerative changes in the lumbosacral spine at the L4-L5 and L5-S1 levels and multilevel degenerative changes in the cervical spine but with normal spinal cord appearance and signal intensity.  Tr. 391-394.  Also, on September 2nd Mellott had a follow-up appointment with Dr. Turel.  Tr. 397-399.   Mellott's reported symptoms remained essentially the same. Id.  After conducting a physical examination which was essentially normal, including normal motor strength in the upper and lower extremities and intact sensation, and reviewing the results of the MRIs, Dr. Turel's diagnostic impression was that Mellott suffered from dysesthesia of an undetermined etiology; muscular headaches; obesity; and there was no evidence that Mellott suffered from multiple sclerosis. Tr. 398. Dr. Turel stated: "The patient's MRIs of the cervical as well as the lumbosacral spine do not show any significant abnormalities. The lumbosacral spine was reviewed with the patient and her husband as was the cervical spine. These do not show any evidence of significant disk protrusion. The foramina of the

---

[26]"A demyelinating disease is any condition that results in damage to the protective covering (myelin sheath) that surrounds nerve fibers in your brain and spinal cord. When the myelin sheath is damages, nerve impulses slow or even stop, causing neurological problems.  Multiple sclerosis (MS) is the most common demyelinating disease of the central nervous system.  In this disorder, your immune system attacks the myelin sheath or the cells that produce and maintain it." Jerry W. Swanson, M.d., Diseases and Conditions, What are the types of demyelinating disease that affect the central nervous system and what can you do about them?, Mayo Clinic, http://www.mayoclinic.org/demyelinating-disease/expert-answers/FAQ-20058521 (Last accessed March 3, 2015).

roots are all normal. The cervical spinal cord clearly shows no abnormalities to be present.  I gave the patient reassurance and advised her that she needed to continue an exercise program and lose weight.  This is going to make her feel much better and probably relieve some of her aching."[27]  Tr. 398-399.  Dr. Turel advised Mellott to continue to use non-narcotic pain medications. Tr. 399.

Also, on September 2, 2010, Mellott had an appointment with Lori A. Lavelle, D.O., a rheumatologist, at the Altoona Arthritis & Osteoporosis Center, located in Duncansville, Pennsylvania, based on a referral from Mellott's primary care physician, William Milroth, M.D. Tr. 322-324.  Mellott told Dr. Lavelle that she had "a several-year history of joint pain" and that since December, 2008, when she was involved in a motor vehicle accident she had been dealing with pain. Tr. 322. Mellott further stated that since the beginning of 2010 when she had a flu vaccine she had suffered from diffuse joint and muscle pain. Id.  Mellott reported that she "now aches all over" and has "constant fatigue." Id.  Dr. Lavelle conducted a physical examination the results of which were essentially normal other than

---

[27]The report of the MRI of the lumbar spine stated that there was "mild central canal stenosis" and "mild bilateral neural foramina stenosis" at the L4-L5 level; and "mild indentation of the exiting nerve root in the proximal portion" and 'bilateral mild to moderate neural foramina stenosis" at the L5-S1 level. Tr. 393.

positive tenderness at multiple fibromyalgia trigger points[28] and "crepitus with range of motion of both knees." Tr. 323.   After performing the physical examination Dr. Lavelle "suspect[ed] that [Mellott suffered from] a combination of osteoarthritis and fibromyalgia" but that blood tests and other diagnostic tests would have to be performed to rule out other conditions. Id.   In the interim Dr. Lavelle gave Mellott samples of Cymbalta and a prescription for that drug[29] and scheduled a follow-up appointment. Id.

On September 27, 2010, Mellott had x-rays performed of her hands, pelvis, and knees. Tr. 328.  The x-rays of the hands were normal. Id.  The x-ray of the pelvis

---

[28]"Fibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues." Fibromyalgia, Definition,  Mayo Clinic staff, http://www.mayoclinic.org/diseases-conditions/fibromyalgia/basics/definition/con-20019243 (Last accessed March 3, 2015).  At one point fibromyalgia was only diagnosed if a patient had 11 out of 18 positive tender or trigger points. The trigger or tender point testing was actually developed only for research studies but medical professionals began to use it for diagnostic purposes. Presently, a diagnosis can be made if a patient has widespread pain for more than 3 months with no underlying medical condition that could cause the pain.  There is no blood test or objective criteria for such a diagnosis to be made. However, some physicians still rely on the tender point examination and attempt to rule out other possible causes, including rheumatological and autoimmune disorders. Fibromyalgia, Tests and diagnosis,  Mayo Clinic staff, http://www.mayoclinic.org/diseases-conditions/fibromyalgia/basics/tests-diagnosis/con-20019243 (Last accessed March 3, 2015).

[29]Cymbalta "is used to treat major depressive disorder in adults. It is also used to treat general anxiety disorder in adults [and] . . . to treat fibromyalgia . . . or chronic muscle or joint pain (such as low back pain and osteoarthritis pain)." Cymbalta, Drugs.com, http://www.drugs.com/cymbalta.html (Last accessed March  4, 2015).

revealed sclerosis[30] of the sacroiliac joints and degenerative changes of the L5 vertebral body. Id.   The x-rays of the knees were normal except for narrowing of the patellofemoral (the knee cap and the thigh bone) joint space of the right knee. Id.   Also, on September 27th blood was withdrawn and tested, including several tests for autoimmune disorders, such as rheumatoid arthritis. Tr. 318 and 329.   The blood tests for those conditions were normal.[31] Id.

On October 28, 2010, Mellott had an appointment at the Altoona Arthritis & Osteoporosis Center with a M. Smith, a certified physicians assistant, regarding her ongoing complaints of widespread pain. Tr. 318-320.   Mellott reported that she was very busy because she was working and going to school.[32]  Tr. 318.   A physical examination of Mellott revealed positive tenderness at multiple fibromyalgia trigger points. Tr. 319.   The diagnostic assessment was that Mellott suffered from

---

[30]Sclerosis is the hardening or thickening of a tissue as the result of inflammation. See Dorland's Illustrated Medical Dictionary, 1680 (32nd Ed. 2012).

[31]Blood tests were performed for the sedimentation rate (ESR),  rheumatoid factor (RF)  and  antinuclear antibodies (ANA).  "The antinuclear antibody (ANA) test is used as a primary test to help evaluate a person for autoimmune disorders that affect many tissues and organs throughout the body (systemic) and is most often used as one of the tests to diagnose systemic lupus erythematosus (SLE)." Lab Tests Online, ANA, http://labtestsonline.org/understanding/analytes/ana/tab/test (Last accessed March 3, 2015)

[32]In 2007 Mellott earned $15,456.89; in 2008 she earned $18, 727.26; in 2009 she earned $23,770.00; and, as stated earlier, in 2010 she earned $27,941.06. Tr. 179.

osteoarthritis, myalgia (muscle pain) and questionable pernicious anemia.[33]   Mellott

was prescribed a B12 supplement, the nonsteroidal anti-inflammatory drug Mobic,

and Savella, a drug used to treat fibromyalgia. Id.   Although the record of this

appointment was electronically signed by Dr. Lavelle, it is not clear that she

examined Mellott. Id.

The next record is of a medical appointment Mellott had with physician

assistant Smith at the Altoona Arthritis & Osteoporosis Center  on January 27, 2011,

the day after Mellott's alleged disability onset date. Tr. 316-317.  Mellott reported

that she had good and bad days and the bad days averaged 1 day per week.  Id.

Mellott complained of significant pain in her shoulder blades, neck, legs, feet, and

arms. Id.  The pain in the left arm was greater than the right. Id.  The pain was

described as constant but the intensity varied. Id.  Mellott reported an episode of

ankle swelling but that it improved after taking the diuretic Lasix.  Id.  Mellott

stated that she had not seen significant improvement in her condition with the

drugs Mobic and Savella. Id.  She complained of difficulty sleeping and restless leg

syndrome.  Id.  Her current medications were listed as Mobic, Savella, Lortab (a

combination of the narcotic hydrocodone and acetaminophen), Vitamin D and

Vitamin B12. Id.  A physical examination of Mellott revealed positive tenderness at

multiple fibromyalgia trigger points. Id.  The diagnostic assessment was that Mellott

suffered from fibromyalgia syndrome, osteoarthritis,  and a low vitamin B12 level.

---

[33]The blood tests revealed that Mellott had a low hematocrit which can be a
sign of anemia. Tr. 318 and 330. The tests also revealed that she had a low vitamin
B12 level and low red blood cell count.

Mellott's dosage of Savella was increased, as well as her dosage of Lortab, and she was started on the drug Ambien for her sleep problems. Id.  She also was given a prescription for a diuretic to be taken as needed for leg swelling and she was referred to aquatherapy at Shippensburg Physical Therapy & Sports Medicine for the pain in her neck, shoulders, low back and hips. Id.  Although the record of this appointment was electronically signed by Dr. Lavelle, it is not clear that she examined Mellott. Id.

Mellott underwent an initial physical therapy evaluation at Shippensburg Physical Therapy & Sports Medicine on January 31, 2011. Tr. 336-337.   The physical therapist's assessment was that Mellott

> present[ed] with subjective, objective and functional deficits associated with arthritis and fibromyalgia that can be addressed by physical therapy intervention. [Mellott had] general muscle weakness of [the] bil[ateral upper extremities], [lower extremities] and core muscle. Tightness present in [the] bil[ateral] upper trapezius, hamstrings and gastrocnemius muscles. [Mellott] reports increased weakness of [left upper extremity] compared to right, but unable to reproduce it with [manual muscle testing] and myotomal testing.[34] Potential to reach goal: Good.

Tr. 337.   Mellott had appointments at Shippensburg Physical Therapy & Sports Medicine on February 3, 4, 7, 9, 16,  18, 23, and March 11 and 15, 2011, during which she underwent, inter alia, therapeutic exercises and aquatic therapy. Tr. 338-343.

Mellott was reevaluated by a physical therapist on February 18, 2011, and the assessment was that Mellott's

_____

[34]A myotome is a group of muscles supplied by a single nerve root. See Dorland's Illustrated Medical Dictionary, 1226 (32nd Ed. 2012).

> [e]xercise tolerance was slowly improving as [she was] able to tolerate more
> activity in physical therapy. Mellott cont[inued] to have [upper
> extremity],[lower extremity] and postural muscle weakness.  Endurance is
> low and [Mellott was] only able to complete 3 min[utes] on arm bike due to
> fatigue.  Would recommend cont[inued] physical therapy to  work on
> endurance and strength.

Tr. 345.  On February 18, 2011, Mellott's cervical spine range of motion was within normal  limits; her lumbar spine range of motion was within normal limits although she had pain with extension and side bending; the Spurling's,[35] Compression, Traction, and Vertebral Artery Tests were negative; myotomal (muscle) testing was within normal limits throughout; and palpation produced tenderness at the left suboccipital muscles,  bilateral upper trapezius muscles, bilateral thoracic and lumbar paraspinal muscles and the bilateral feet. Id.  The physical therapist recommended 4 more weeks of physical therapy. Id.

On March 4, 2011, Mellott had an appointment with S. Ritchey, a certified registered nurse practitioner, at the Altoona Arthritis & Osteoporosis Center regarding her ongoing complaints of widespread muscular pain. Tr. 314-315.  At this appointment Mellott's primary complaint was that she was suffering from headaches "off and on for the last 6 months or so." Tr. 314.  Mellott reported vomiting twice in the last month and noticed "fuzzy vision" and sensitivity to light.

---

[35]The Spurling's test is an examination to determine whether a patient suffers from cervical spondylosis or radiculopathy.  It is an "evaluation for cervical nerve root impingement in which the patient extends the neck and rotates and laterally bends the head toward the symptomatic side; an axial compression force is then applied by the examiner through the top of the patient's head; the test is considered positive when the maneuver elicits the typical radicular arm pain." MediLexicon, Definition:'Spurling Test, http://www.medilexicon.com/medical dictionary.php?t=90833 (Last accessed March 3, 2015).

Id.  She also reported painful feet. Id.  A physical examination revealed mild to moderate pain and 16 fibromyalgia trigger points and all of the cervical spine vertebrae were painful to palpation as well as both temple regions. Id.  A CT scan of Mellott's head, blood tests and x-rays were ordered. Tr. 315-315.  Also on March 4, 2011, Dr. Lavelle  issued a "To Whom It May Concern" letter in which she stated as follows: "Beth Mellott is a patient of mine at the Altoona Arthritis & Osteoporosis Center. I am currently treating Beth for fibromyalgia and osteoarthritis.  Due to Beth (sic) condition, it is necessary for her to be off work from 01/26/11 continuously through 4/26/11." Tr. 321.

An x-ray of Mellott's cervical spine performed on March 4, 2011, revealed disc space narrowing at the C6-C7 level and osteopenia but was otherwise normal.[36] Tr. 327. The vertebral bodies had normal height, there was no neural foramina narrowing bilaterally, and there was no evidence of fractures or anterolisthesis.[37] Id. Also, on March 4, 2011, Mellott underwent a CT scan of the head and blood tests. Tr. 306 and 385.  The CT scan revealed that the brain was normal.

On March 16, 2011, Mellott visited the emergency department at the Fulton County Medical Center complaining of a wound on her right elbow that was scabbed over and appeared to be infected.  Tr.370.  The area around the wound was

---

[36]Osteopenia is defined as "any decrease in bone mass below the normal." Dorland's Illustrated Medical Dictionary, 1347 (32nd  Ed. 2012).

[37]A retrolisthesis is a backward slippage of a vertebra relative to the one below it and an anterolisthesis is a forward slippage of a vertebra relative to the one below it.

red with red streaks going up her arm. Id.   She arrived at the emergency

department as a "walk in." Id.   After a clinical interview and physical examination,

the attending physician's assessment was that Mellott suffered from cellulitis (a skin

infection) and he prescribed the antibiotic clindamycin.  Tr. 371–372.  Mellott was

advised to follow-up with her primary care physician, Dr. Milroth, within one day,

and discharged from the hospital.  Tr. 372.  Mellott departed the emergency

department by walking. Tr. 445.  Notably, when the attending physician reviewed

Mellott's systems[38] during the clinical interview, Mellott denied "any

musculoskeletal problems." Tr. 371.

On March 31, 2011, Mellott had a follow-up appointment with T. Smith, a

certified physician's assistant, at the Altoona Arthritis & Osteoporosis Center

regarding her headaches. Tr. 377.   Mellott reported that she continued to

experience intermittent headaches, sometimes her head and face are tender to

touch, and she was having more difficulty with her feet. Id.   Mellott stated that she

had an appointment with a podiatrist the next day. Id.   Her immediate and primary

complaint was that she had pain at the base of her neck but that those symptoms

were presently tolerable. Id.   A physical examination revealed multiple

fibromyalgia tender points. Id.. Mellott had positive tenderness of the cervical spine

but fair range of motion. Id.   She also had positive tenderness of the shoulder joints

but full range of motion bilaterally. Id.   The assessment of the physician assistant

---

[38]"The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu/clinicalmed/ros.htm (Last accessed April 21, 2014).

was that Mellott suffered from fibromyalgia syndrome, osteoarthritis, plantar fasciitis and low blood levels of vitamin B12. Id. The record of this appointment was not electronically signed by Dr. Lavelle. Id.

On April 1, 2011, Mellott had an appointment with Diane M. Holdaway, D.P.M., a podiatrist, located in Chambersburg, Pennsylvania. Tr. 413-415. At the appointment Mellott complained of generalized foot pain and heel pain which had been ongoing for about one year. Id. Mellott also complained of pain in her feet even after resting, i.e., post static dyskinesia, and some numbness and tingling in her feet. Id. In reviewing Mellott's systems, Dr. Holdaway reported that there was nothing remarkable other than Mellott's complaints of foot pain. Id. A physical examination revealed that Mellott had normal touch and vibratory sensation in the lower extremities but a positive Tinel's sign with percussion of the posterior tibial nerve of the left lower extremity.[39] Id. Mellott had normal muscles strength and tone in the bilateral lower extremities without atrophy or abnormal movements. Id. Examination of the soles of Mellott's feet revealed pain with palpation of the medial and central band of the plantar fascia of the right and left heel and a flatform deformity bilaterally on weight bearing with heel eversion (turning the heel away from the midline). Id. Dr. Holdaway reviewed radiographs of Mellott's feet and stated that there were no signs of arthritis or fractures. Tr. 414. Dr. Holdaway's impression was that Mellott suffered from plantar fasciitis and she could not rule

---

[39] A positive Tinel's sign suggests that a nerve is irritated.

out Tarsal tunnel syndrome[440] and diabetes. Tr. 415.  Dr. Holdaway administered a steroid injection into Mellott's right and then left heel, referred Mellott to the Parkway Neuroscience and Spine Institute for electrodiagnostic testing (an EMG and nerve conduction study) and ordered blood tests to check for diabetes. Id.  The results of the blood tests performed on April 7, 2011, were normal as well as the electrodiagnostic tests performed on April 12, 2011. Tr. 418-420 and 450.  Dr. DeMarco who performed the electrodiagnostic testing stated as follows: "There is no electrophysiologic evidence of a lumbosacral radiculopathy or plexopathy, bilaterally.  There is no evidence of a tibial nerve entrapment syndrome or a generalized polyneuropathy.  She does have some radicular pain, but I don't think it would explain her foot pain. Today's exam is reassuring there is no significant damage to any lumbar nerve root, or to the tibial nerve at the ankle." Tr. 420.

On April 12, 2011, Mellott had an appointment with Dr. DeMarco regarding complaints of leg pain and a several year history of bilateral foot pain. Tr. 425-428. When Dr. DeMarco reviewed Mellott's systems, Mellott denied fatigue, headache, difficulty breathing, back pain, neck pain, muscle cramps, leg weakness, neck stiffness, calf pain, joint pain, myalgia, pain with walking, anxiety, depression and inability to concentrate.  Tr. 426. The results of a physical examination were completely normal, including Mellott had a normal gait and normal sensation,

---

[40] The tarsal tunnel is a canal in the ankle and foot in which there are nerves, arteries and tendons that maintain function of and support for the foot. One of the nerves that goes through the tarsal tunnel is the tibial nerve, and it provides sensation to the bottom of the foot.  Compression of the tibial nerve within the tarsal tunnel is referred to as tarsal tunnel syndrome.

muscle strength and coordination. Tr. 426-427.  Examination of Mellott's cervical,

thoracic and lumbar spine revealed no tenderness to palpation, no pain, no

paraspinous muscle spasm and normal movements. Id.  Mellott had no tenderness

over the ribs or in the pelvic region. Id.  She had negative straight leg raise tests

bilaterally. Id.  Dr. DeMarco's assessment was that Mellott suffered from

neuralgia/neuritis, not otherwise specified, and paresthesias, and he recommended

physical therapy 2 to 3 times per week and a home exercise program. Tr. 427.

On April 25, 2011, Dr. Lavelle issued a "To Whom It May Concern" letter in

which she stated as follows: "Beth Mellott is a patient of mine at Altoona Arthritis &

Osteoporosis Center. I am currently treating Beth for fibromyalgia and

osteoarthritis. Due to Beth (sic) conditions, it is necessary for her to be off work

until her next office visit with me on June 30, 2011." Tr. 380.  There is no indication

in the record that Mellott was examined by Dr. Lavelle on or about April 25, 2011.

On May 3, 2011, Mellott reported that she was not interested in continuing

with physical therapy and wished to continue with a home exercise program only.

Tr. 451.  Based on that report Dr. DeMarco discharged her from physical therapy on

May 31, 2011. Id.

On May 9, 2011, Mellott had a follow-up appointment regarding her leg pain

with Dr. DeMarco. Tr. 429-432.  At that appointment Mellott apparently appeared

with copies of the MRI reports or images of her cervical and lumbosacral spine. Id.

When Dr. DeMarco reviewed Mellott's systems, Mellott denied fatigue, headache,

difficulty breathing, back pain, neck pain, muscle cramps, leg weakness, neck

stiffness, calf pain, joint pain, myalgia, pain with walking, anxiety, depression and

inability to concentrate.  Tr. 430. The results of a physical examination were completely normal, including Mellott had a normal gait and normal sensation, muscle strength and coordination. Tr. 430-431.  Examination of Mellott's cervical, thoracic and lumbar spine revealed no tenderness to palpation, no pain, no paraspinous muscle spasm and normal movements. Id.  Mellott had no tenderness over the ribs or in the pelvic region. Id.  She had negative straight leg raise tests bilaterally. Id.  Dr. DeMarco stated that the MRI of the cervical spine showed mild degenerative joint disease, no nerve compression and no stenosis but that the MRI of the lumbar spine revealed mild degenerative joint disease and mild stenosis at the L4-L5 level and bulging at the L5-S1 level. Tr. 431.  Dr. DeMarco opined that the mild stenosis and bulging might explain some of Mellott's symptoms. Id.  Dr. DeMarco's assessment was that Mellott suffered from neuritis/lumbosacral, not otherwise specified, lumbosacral spondylosis, and paresthesias (pins and needles), and he recommended that she receive steroid injections to address her pain which Dr. DeMarco subsequently administered on three occasions during May and June. Id. Specifically, on May 16, 2011, Mellott received steroid injections at the L5-S1 levels of the lumbosacral spine; on June 6, 2011, Mellott received steroid injections at the left sacroiliac joint; and on June 27, 2011, Mellott received steroid injections at the left and right sacroiliac joints. Tr. 438-439 and 460-463.

On May 13, 2011, Sharon Becker Tarter, Ph.D., a psychologist, reviewed Mellott's medical records on behalf of the Bureau of Disability Determination and concluded that Mellott did not suffer from a medically determinable mental impairment.  Tr. 74.

On June 24, 2011, Mellott had an appointment with Khatuna Gurgenashvilli, M.D., a neurologist, at Parkway Neuroscience and Spine Institute, "for the evaluation of possible [multiple sclerosis]." Tr. 456-459.  Mellott told Dr. Gurgenashvilli that she had pain in her feet and paresthesias and the pain in her feet fluctuates and it is worse at night or if she wears sneakers or tight shoes; she has tingling and numbness in her toes and a stinging, burning pain; she has lower back pain, hip pain, pain in between the shoulder blades, neck pain, and headaches; she has a band like sensation around her rib cage and when she takes a deep breath she experiences a shooting tingling in her arms and fingers; she has blurred vision and worsening posterior headaches and at times she feels nauseous and photophobic with the headaches; she has leg pain with walking and weakness in her extremities; and she has anxiety. Tr. 456-457.   There were no abnormal physical examination findings.  Tr. 457.   Mellott's mood and affect were normal; she was alert and oriented to person, place, date and situation; no abnormal visual problems were noted; there was no weakness noted in the facial muscles; she had normal strength in the muscles of the upper and lower extremities; she had inconsistent sensation for temperature and pinprick in her feet; her sensation for vibration and proprioception were intact throughout; she had a normal Romberg test; her upper extremity reflexes were essentially normal; her lower extremity reflexes were diminished; her coordination and gait were normal;  she was able to walk on her toes and heels; and she was able to tandem walk.  Tr. 457-458.  Dr. Gurgenashvilli stated that Mellott presented with generalized pain, feet paresthesias and burning, but that her EMG did not support the diagnosis of

peripheral neuropathy or lumbar radiculopathy. Tr. 458.  Dr. Gurgenashvilli opined that further testing was needed to rule out small fiber neuropathy.[41] Id.  Dr. Gurgenashvilli made no definitive diagnosis and ordered further diagnostic tests, including blood tests and an MRI of the cervical spine.  Id.  He gave Mellott a prescription for gabapentin[42] to help with her paresthesias as well as to help her fall asleep at night, and recommended that she try a topical lidocaine ointment for the pain in her feet. Id.

On June 30, 2011, Mellott had a follow-up appointment with M. Lyons,  a certified physicians assistant, at the Altoona Arthritis & Osteoporosis Center regarding her alleged ongoing pain symptoms. Tr. 467-468.  Mellott reported that she had filed for social security disability and was waiting for a decision. Id.  Mellott reported that she continued to experience myalgia and diffuse paresthesias and that she was taking Savella but it was upsetting her stomach and that she discontinued taking it for a few days and had more muscle spasms. Id.  A physical examination revealed multiple fibromyalgia tender points. Id.  The assessment of the physician assistant was that Mellott suffered from fibromyalgia, osteoarthritis, and plantar

---

[41] Small fiber neuropathy is a dysfunction of the nerves in the skin of the hands and feet but can be found in other areas of the body.  On of the most common causes in diabetes.  See Small fiber neuropathy, Cleveland Clinic Journal of Medicine, http://www.ccjm.org/index.php?id=107953&cHash=010515 &tx_ttnews[tt_news]=362009 (March 3, 2015).

[42] Gabapentin (one brand name Neurontin)  "is an anti-epileptic medication, also known as an anticonvulsant . . . used to treat nerve pain . . . ." Gabapentin, Drugs.com, http://www.drugs.com/gabapentin.html (Last accessed March 3, 2015).

fasciitis. Id.  The physician assistant stated that Mellott "will NEVER be able to perform ANY type of gainful employment due to the severity of her fibromyalgia despite medications." Id. Although the record of this appointment was electronically signed by Dr. Lavelle, it is not clear that she examined Mellott. Id.

On July 19, 2011, Michael J. Mesaros, M.D., reviewed Mellott's medical records on behalf of the Bureau of Disability Determination and concluded that Mellott suffers from the medically determinable severe impairments of fibromyalgia and  degenerative disc disease, and the non-severe impairment of plantar fasciitis. Tr. 73-78.  Dr. Mesaros concluded that, even in light of Mellott's medically determinable impairments, she could perform a limited range of light work. Tr. 75-78.  Specifically, Dr. Mesaros found that Mellott could occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds; she could stand and/or walk 6 hours in an 8-hour workday; she could sit 6 hours in an 8-hour workday; she could occasionally climb ramps, stairs, ladders, ropes and scaffolds; she could occasionally balance, stoop, kneel, crouch and crawl; she had no manipulative, visual or communicative limitations; she was unlimited with respect to extreme cold and heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases and poor ventilation; and she had to avoid even moderate exposure to hazards, such as fast moving machinery and unprotected heights. Id.

On September 7, 2011, Mellott underwent an MRI of the cervical spine which revealed the following:

> The cranioverteberal junction is normal.  The cervical spinal cord is normal in contour.  No intramedullary lesion is seen within the cervical spinal cord. No compression fractures of the cervical vertebral bodies.  The anterior vertebral spondylosis at C6-C7. (sic) Inconsistently seen, there is a tiny non compressive central disc protrusion at C6-C7 without evidence of cervical spinal cord or nerve compression. Low-grade non compressive disc bulges are seen at C4-C5 through C7-T1. The cervical neural foramina appear patent. No pathologic enhancement.

Tr. 526.  Also, on September 7, 2011, Mellott underwent an MRI of the brain which was reported as normal. Tr. 524.

On September 19, 2011, Mellott had an appointment with Dr. Gurgenashvili regarding her muscle pain and to review the recent MRIs. Tr. 492-495.  Mellott reported that she started taking gabapentin and it significantly helped her paresthesias and leg cramps but that she stopped taking gabapentin as well as Savella when she lost health insurance and her pain flared up. Tr. 492.  Mellott reported that she had an urge to move her legs and cramps in her legs at night. Id. Mellott denied any arm pain or weakness, decreased memory, dizziness, fainting, incoordination, seizures, loss of consciousness, headaches, blurred vision, double vision, visual loss, depression, and inability to concentrate. Tr. 493.  A physical examination revealed that Mellott had no tenderness or pain to palpation in the cervical or lumbar spine and normal range of motion. Tr. 494.  Mellott had negative straight leg raising tests bilaterally and negative cervical distraction and foraminal compression/Spurling's tests; she had normal muscle strength in the upper and lower extremities; she had no sensory deficits in the feet but she did have paresthesias; her reflexes were essentially normal except in the knees and ankles; she had normal coordination and gait; and she was able to walk on her heels and

toes as well as tandem walk.  Id.  Dr. Gurgenashvilli noted that the MRI of the brain was normal and that the MRI of the cervical spine revealed [m]ild spondylosis at C6-C7" and "mild disc bulges without nerve compression." Tr. 492 and 494.   Dr. Gurgenashvilli concluded that there was nothing to suggest that Mellott suffered from a demyelinating disease or multiple sclerosis and that the symptoms in her legs and feet were consistent with a small fiber sensory neuropathy and restless leg syndrome.  Tr. 494.  Dr. Gurgenashvilli further noted that Mellott was being treated for fibromyalgia by a rheumatologist and recommended that Mellott follow-up with the rheumatologist and restart Savella. Id.  He also recommended that Mellott commence taking gabapentin and discuss further treatment options with Dr. DeMarco regarding her alleged pain symptoms. Id.

On September 22, 2011, Mellott had a follow-up appointment with M. Zumer, a  certified physicians assistant, at the Altoona Arthritis & Osteoporosis Center regarding her alleged ongoing pain symptoms. Tr. 467-468.   Mellott reported that she had increasing pain in her neck, shoulders, rib cage region, knees and toes. Tr. 534.  She also complained of ongoing paresthesias in her hands and legs. Id.  A physical examination revealed multiple fibromyalgia tender points. Id.  The assessment of the physician assistant was that Mellott suffered from fibromyalgia and osteoarthritis. Id.  Mellott was restarted on Savella and prescribed the drug Neurontin and advised to continue to take the nonsteroidal anti-inflammatory drug Daypro and Lortab. Id.  Although the record of this appointment was electronically signed by Dr. Lavelle, it is not clear that she examined Mellott. Tr. 535.

On September 27, 2011, Dr. Lavelle completed on behalf of Mellott a document entitled "Fibromyalgia Medical Source Statement" in which she opined that Mellott was unable to engage in any type of full-time substantial gainful employment.  Tr. 480-483.  Specifically,  she stated that Mellott could sit, stand and walk a total of less than 2 hours in an 8-hour workday and even during that less than 2 hour period Mellott would have to change positions at will. Tr. 481.

On November 23, 2011, Mellott had an appointment with Rebecca L. Snyder, a certified physician's assistant, at Parkway Neuroscience and Spine Institute regarding complaints of low back and knee pain. Tr. 488-491. Mellott reported that her knee pain was a 9 on a scale of 1 to 10 and that the pain in the left knee had "really increased since zumba classes." Tr. 488.  Mellott denied vision problems, headaches, arm pain and weakness, incoordination, anxiety, depression and inability to concentrate. Tr. 489.  Other than some mild tenderness and pain over the spine and paraspinal muscles, an antalgic gait and some left knee tenderness, the results of a physical examination were essentially normal. Tr. 490.  Mellott's sensation was intact to light touch globally; she had normal muscle strength in the lower extremities; she had normal reflexes and coordination throughout; lumbar range of motion (flexion and extension) was within normal limits; she had mild tenderness over the bilateral lumbar paraspinal muscles; she had mild pain "over [the] spine/paraspinal muscles;" and movement testing (flexion, extension, right and left side gliding) while standing did not affect her pain. Id.  Ms. Snyder recommended a trial of the drug Celebrex for joint pain and recommended that

Mellott consider Supartz (hyaluronic acid) knee injections. Id.  She also ordered an MRI of the left knee. Id.

There is no indication that Mellott followed through with Ms. Snyder's recommendations regarding her knee pain.  On December 5, 2011, Mellott underwent radiofrequency ablation of the left medial branch nerves at the L5, S1, S2 and S3 levels of the lumbosacral spine. Tr. 511-512.  At an appointment with Ms. Snyder on December 20, 2011, Mellott reported that her left knee pain was much better since she stopped doing her zumba exercises. Tr. 485.  Mellott also reported that she had 5 days of back pain relief as a result of the radiofrequency ablation and that overall her back pain had improved, i.e.,  not as bad as it was prior to the radiofrequency ablation. Id.  Mellott denied vision problems, headaches, arm pain and weakness, incoordination, anxiety, depression and inability to concentrate. Id. Physical examination findings remained the same. Tr. 486-487.

On January 18, 2012,  Mellott had an appointment with nurse practitioner Ritchey at the  Altoona Arthritis & Osteoporosis Center regarding her ongoing complaints of widespread muscular pain. Tr. 532-533.  A physical examination revealed mild to moderate pain at 16 fibromyalgia trigger points, all of her vertebrae were painful to palpation, and she had positive allodynia.[43] Tr. 532.  The assessment was that Mellott suffered from fibromyalgia and osteoarthritis. Id.  Ms. Richey discontinued Mellott's prescription for gabapentin and the anxiety medication

---

[43] Allodynia is defined as "pain resulting from a non-noxious stimulus to normal skin." Dorland's Illustrated Medical Dictionary, 51 (32nd Ed. 2012).

clonazepam and prescribed the sleep aid Restoril and the nonsteroidal anti-inflammatory drug Celebrex. Id.  Although the record of this appointment was electronically signed by Dr. Lavelle, it is not clear that she examined Mellott. Id.

On May 23, 2012, Mellott was seen by physician assistant Zumer at the Altoona Arthritis & Osteoporosis Center regarding her ongoing fibromyalgia and osteoarthritis symptoms. Tr. 543-544.  Mellott reported "more pain and swelling in her hand[s] and wrists." Tr. 543. A physical examination revealed multiple fibromyalgia trigger points. Id.  The assessment was that Mellott suffered from fibromyalgia and osteoarthritis. Id.  Although the record of this appointment was electronically signed by Dr. Lavelle, it is not clear that she examined Mellott. Id.  X-rays of Mellott's hands performed on the same day revealed "[s]ome joint space narrowing throughout the [proximal interphalangeal][44] and [distal interphalangeal][445] joints of both hands." Tr. 545.

On August 20, 2012, Mellott underwent epidural steroid injections in the lumbosacral spine administered by Dr. DeMarco and on August 21, 2012, Mellott was examined by physician assistant Zumer at the Altoona Arthritis & Osteoporosis Center. Tr. 548-551.  Physician assistant Zumer noted that the x-rays of Mellott's hands revealed "no evidence of any definite erosions." Tr. 550.  A physical examination revealed multiple fibromyalgia trigger points, hands without definitive

---

[44] The second joint from the tip of a finger other than in the thumb.

[45] The first joint from the tip of a finger.

synovitis,[46] and tender hips. Id.  The assessment was that Mellott suffered from fibromyalgia, osteoarthritis, history of low Vitamin D levels, mild leukopenia (low white blood cell count), and sleep disturbance. Id.  Mr. Zumer continued Mellott's prescription for Celebrex and noted a concern that Mellott was being overmedicated with sedative agents, including the antidepressant Elavil, Restoril, Ambien, Xanax and gabapentin. Id.  He also noted a concern that Mellott was taking 6 tablets of hydrocodone per day and deferred a request for a higher dose of that medications to her pain management specialist. Tr. 551.  Although the record of this appointment was electronically signed by Alan Kivitz, M.D.,  it is not clear that he examined Mellott. Id.

On August 23, 2012, at the request of Dr. Lavelle, Mellott had an appointment for the first time with John Paul Malayil, M.D., a pain management specialist, at Summit Pain Medicine, located in Chambersburg, Pennsylvania, for an evaluation of her "shoulder pain and total body pain." Tr. 558-560.  Mellott reported that "the majority of her pain is localized between her shoulder blades" and she "described this pain as being a deep achy sensation that is constantly there."  Tr. 558.  She also stated that "there is a component of burning sensation as well" and it is "the worst upon awakening in the morning" but she immediately takes "2 Lortab and one

---

[46] Synovitis is defined as "inflammation of a synovium; it is usually painful, particularly on motion, and is characterized by a fluctuating swelling due to effusion within a synovial sac." Dorland's Illustrated Medical Dictionary, 1856 (32nd Ed. 2012).

Flexeril before starting her day" and then "[a]fter taking a brisk walk around the house and loosening up her muscles . . . she is usually ready for the day." Id.

A physical examination revealed that Mellott had diffuse tenderness to palpation in the region of the trapezius muscle of the upper back; she had no cervical facet joint tenderness; she had normal flexion, extension and lateral rotation of the neck; she had a negative Spurling's test on the right side and mildly positive on the left for reproducing a tingling sensation in her left hand; she had mildly decreased strength (4+/5) in the bilateral upper extremities; she had intact sensation to light touch in the bilateral upper extremities; and she had essentially normal reflexes throughout. Tr. 559. Dr. Malayil's assessment was similar to the assessment of Dr. Lavelle. Tr. 560. Dr. Malayil opined that Mellott suffered from myalgia, myositis (muscle inflammation) and rheumatism. Id. He concluded that Mellott would benefit from aerobic exercise consisting of swimming 30 minutes per day, 3 times per week, and from trigger point injections in her trapezius muscle. Id. He also recommended that her dosage of gabapentin be increased. Id. Dr. Malayil administered trigger point injections to Mellott's bilateral trapezius muscles on August 27, 2012. Tr. 556-557.

Mellott had a follow-up appointment with Dr. Malayil on October 3, 2012. Tr. 553-554. At that appointment Mellott reported that the trigger point injections relieved her pain for approximately 2 weeks and during that time she traveled to Colorado with her husband. Tr. 554. Mellott further reported that she had mild pain with breathing, not all the time, but it does occur "usually after activity such as digging vegetables out of the ground." Id. Mellott noted that gardening "often

exacerbate[s] her pain symptoms. Id.   Dr. Malayil's physical examination findings and diagnostic assessment essentially remained the same. Id.   Dr. Malayil advised Mellott to take her medications as prescribed, increased her dosage of gabapentin, referred her to physical therapy for a home exercise program and to obtain a TENS unit, and scheduled her for trigger point injections in 4 weeks. Tr. 555.

At the administrative hearing held on November 29, 2012,  Hayden Christian Alexander, III, M.D., a board certified rheumatologist and internist, testified regarding Mellott's medical conditions and her functional abilities. Tr. 52-59.   Dr. Alexander reviewed all of the medical evidence of record. Tr. 53.   No objections were raised to Dr. Alexander's testimony regarding Mellott's medical conditions and functional abilities.  Id.   Dr. Alexander concluded that Mellott suffered from fibromyalgia, degenerative disc disease, sacroiliitis and plantar fasciitis but that none of those conditions singly or in combinations met or equaled the requirements of a listed impairment. Tr. 53-54.  Dr. Alexander further found that Mellott had the functional ability to lift/carry 20 pounds occasionally and 10 pounds frequently; she was limited to sitting, standing, and walking for four hours each, with a sit/stand option; she could not climb ropes or ladders, or work on scaffolding; she could occasionally climb stairs and ramps; she could occasionally bend, stoop, kneel and crawl; she had no limitations with fingering, handling or manipulating objects; she had no environmental limitations; and she could not work around heavy machinery or at unprotected heights. Tr. 54-55.

IV.    **Discussion**

The administrative law judge at step one of the sequential evaluation process found that Mellott did not engage in substantial gainful work activity during the period from her alleged onset date of January 26, 2011,  through the date of the decision. Tr. 21.

At step two of the sequential evaluation process, the administrative law judge found that Mellott had the following severe impairments: "Fibromyalgia, Sacroiliitis, and Degenerative Disc Disc." Id.   The administrative law judge found that Mellott's plantar fasciitis was a non-severe impairment. Tr. 22.   Mellott has not challenged the administrative law judge's step two analysis.

At step three of the sequential evaluation process the administrative law judge found that Mellott's  impairments did not individually or in combination meet or equal a listed impairment. Tr. 22-23.  Mellott has not challenged the administrative law judge's step three analysis.

At step four of the sequential evaluation process the administrative law judge found that Mellott had the residual functional capacity to perform a limited range of light work. Tr. 23.   Specifically, Mellott was found to have the capacity to stand, walk, and sit for four hours each with an option to sit and stand at will; she can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; she can never push or pull foot controls, or climb ladders, ropes, or scaffolds; and she must avoid concentrated exposure to unprotected heights and heavy machinery with rapidly moving parts. Tr. 23 and 61-62.

Based on this residual functional capacity and the testimony of a vocational expert the administrative law judge found that Mellott could perform two unskilled, light and two unskilled, sedentary positions. Tr. 28.  Specifically, Mellott could perform light work as bakery worker and as a cashier, and sedentary work as a security systems monitor and dowel inspector and that there were a significant number of such jobs in the local, state and national labor markets. Tr.  28 and 62-63. The vocational expert testified that each of these positions provided for a sit/stand option. Id.

In concluding that Mellott had the residual functional capacity to engage in this limited range of unskilled,  light and sedentary work, the administrative law judge relied, *inter alia*, on the opinion of the state agency physician, Dr. Mesaros, and the testimony of Dr. Alexander. Tr. 24-26.   The administrative law judge further considered Mellott's medical records and the objective findings contained therein and Mellott's activities of daily living. Id.

The administrative law judge further found that Mellott's statements concerning her limitations were not credible to the extent that they were inconsistent with the ability to perform a limited range of unskilled, light and sedentary work. Tr. 24-25.  The administrative law judge in addressing Mellott's credibility stated in part as follows:

> Despite the claimant's allegations of chronic muscle and joint pain, restricted ranges of motion, weakness, fatigue, difficulty sleeping, lack of concentration, and an inability to maintain substantial gainful activity, the claimant admitted she could perform activities of daily living with little, if any, assistance [].  The claimant could shower, dress, prepare simple meals, do household chores such as laundry and light cleaning, drive, travel independently, shop in stores, and gardening []. She is able to exercise by

42

swimming in her pool and doing aerobics and Zumba []. Despite the
allegations of symptoms and limitations preventing all work, the record
reflects that the claimant went on a vacation since the alleged onset date.
She also is able to drive to Colorado with her husband for a vacation.
Although a vacation and a disability are not necessarily mutually exclusive,
the claimant's decision to go on a vacation tends to suggest that the alleged
symptoms and limitations may have been overstated, such as an inability to
sit for more than    for a period [].  Additionally, the claimant is able to do
gardening, outdoors that includes digging up vegetables[]. While she claims
she is in pain the next day, the activity suggests a greater functioning.
Further, the claimant has not been consistent with medication compliance,
which the pain management physician indicates could limit improvement in
pain on a daily basis[].  In addition to the daily activities of household chores
and gardening, the claimant is able to maintain part-time employment of
working at home for several hours per month doing billing[]. Despite the
claimant's allegation that she has difficulty concentrating, her medical
providers do not note a lack of concentration, she exhibits little, if any,
difficulty at the disability hearing, and she reports that she can drive and
manage money[], which suggests a greater degree of concentration than
alleged. While none of these factors alone is inconsistent with a finding of
disability, taken together, they are suggestive of an individual capable of
performing a greater degree of functionality than alleged and of an individual
able to perform work activity on a sustained basis[].

Tr. 25.  Even in light of these findings, the administrative law judge gave Mellott

the benefit of the doubt with respect to certain activities.  Tr. 26.  Specifically, in

contrast to Dr. Mesaros, the administrative law judge found that Mellott could never

use foot controls, or climb ladders, ropes, or scaffolds. Tr. 23 and 26.

The administrative record in this case is 561 pages in length, primarily

consisting of medical and vocational records.  The administrative law judge did an

adequate job of reviewing Mellott's medical history and vocational background in

his decision. Tr. 19-29.

Mellott argues that the administrative law judge erred by (1) relying on the

testimony of the medical expert, who testified that his opinion did not consider

Mellott's subjective complaints, but rather relied solely on objective findings; (2)

failing to accord significant weight to the opinions of Mellott's treating rheumatologist; and (3) finding that Mellott's allegations regarding her symptoms and daily activities were not generally credible. We have thoroughly reviewed the record in this case and find no merit in Mellott's arguments.

The Social Security regulations require that an applicant for disability insurance benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled." 20 C.F.R. § 404.1512(c).

No treating physician, other than Dr. Lavelle, has indicated that Mellott during the relevant time period suffered from physical functional limitations which precluded her from engaging in the limited range of unskilled sedentary to light work set by the administrative law judge in his decision for the requisite statutory 12 month period.[47] In contrast, there are two medical opinions in the record which support the residual functional capacity set by the administrative law judge. Dr. Alexander testified that Mellott could engage in a limited range of light work and Dr. Mesaros's opinion fully supports the decision of the administrative law judge. The administrative law judge's reliance on the opinions of Dr. Alexander and Dr. Mesaros was clearly appropriate. See Chandler v. Commissioner of Soc. Sec., 667

---

[47] To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).

F.3d. 356, 362 (3d Cir. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

The social security regulations specify that the opinion of a treating physician may be accorded <u>controlling</u> weight only when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. Likewise, an administrative law judge is not obliged to accept the testimony of a claimant if it is not supported by the medical evidence.  An impairment, whether physical or mental, must be established by "medical evidence consisting of signs, symptoms, and laboratory findings," and not just by the claimant's subjective statements.  20 C.F.R. § 404.1508 (2007).  In this case the administrative law judge appropriately considered the objective medical evidence and the court is convinced that the opinions of Dr. Alexander and Dr. Mesaros support the administrative law judge's decision and the rejection of the opinion of Dr. Lavelle.

Furthermore, the court discerns nothing inappropriate in the manner in which the administrative law judge considered the testimony and opinion of Dr. Alexander.  Under Social Security Ruling 96-8p, it was the administrative law judge's responsibility to assess the credibility of Mellott's subjective complaint when assessing the residual functional capacity.  In contrast, Dr. Alexander was to consider the objective medical evidence in rendering an opinion regarding Mellott's functional abilities.  The administrative law judge found that Mellott's statements about her functional limitations were not credible to the extent they were

inconsistent with the assessed residual functional capacity. Tr. 24.   When there is a paucity of objective medical facts supporting a claimant's alleged symptoms, the administrative law judge must consider the claimant's credibility.  To the extent that Mellott argues that the administrative law judge did not properly consider her credibility, the administrative law judge was not required to accept Mellott's claims regarding her physical impairments. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make). It is well—established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility.").  Because the administrative law judge observed and heard Mellott testify, the administrative law judge is best suited to assess her credibility.

We are satisfied that the administrative law judge appropriately took into account all of Mellott's physical limitations in the residual functional capacity assessment.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  Therefore, the court will affirm the decision of the Commissioner.

An appropriate order will be entered.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:        March 12, 2015